UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| GERALD REED, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:21-CV-478 RLM-MGG |
| | ) | |
| WILLIAM HYATTE and | ) | |
| GEORGE PAYNE, JR., | ) | |
| | ) | |
| *Defendants* | ) | |

OPINION AND ORDER

Gerald Reed has sued Warden William Hyatte and Deputy Warden George Payne, Jr., in their individual capacities, alleging that they subjected him to unconstitutional conditions of confinement while he was imprisoned at Miami Correctional Facility. Mr. Reed sued from prison, so the Prison Litigation Reform Act's requirement that he exhaust all administrative remedies before suing over prison conditions applies. *See* 42 U.S.C. § 1997e(a). The defendants have moved for summary judgment, and Mr. Reed has cross-moved for summary judgment, on the issue of exhaustion of administrative remedies. Mr. Reed requests oral argument to present legal arguments but not additional evidence. Neither party requested a Pavey hearing. *See* Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008).

For reasons explained in this opinion and order, the court DENIES the defendants' motion for summary judgment [Doc. 17], GRANTS Mr. Reed's motion

for summary judgment, [Doc. 32], and DENIES AS MOOT Mr. Reed's request for oral argument. [Doc. 46].[1]

LEGAL STANDARD

A party is entitled to summary judgment when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, a court "constru[es] all facts and draw[s] all reasonable inferences in favor of the party against whom the motion under consideration was filed." Hess v. Bd. of Trs. of S. Ill. Univ., 839 F.3d 668, 673 (7th Cir. 2016) (citation omitted). A party can't merely allege a disputed material fact to defeat summary judgment; "instead the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); see also Fed. R. Civ. P. 56(e)(2).

A defendant isn't entitled to a jury trial on contested issues involving exhaustion. Wagoner v. Lemmon, 778 F.3d 586, 590 (7th Cir. 2015) (discussing Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008)). A court holds a Pavey hearing to resolve issues of fact bearing on exhaustion, but "[w]hen there are no disputed

---

[1]    Mr. Reed's action was consolidated for pretrial, non-dispositive matters with several other cases with similar allegations against the same defendants, [Doc. 17], and he requests consolidated oral argument. [Doc. 46]. The exhaustion defense is a dispositive matter, so the court resolves the issue in separate orders.

facts regarding exhaustion, only a legal question, the court may resolve the issue without a hearing. <u>Vela v. Ind. Dep't of Corr.</u>, No. 3:16 CV 51, 2017 U.S. Dist. LEXIS 9279, at *2 (N.D. Ind. Jan. 24, 2017).

BACKGROUND

Gerald Reed alleges that Warden Hyatte and Deputy Warden Payne violated his constitutional rights when they kept him in a restrictive housing unit cell at Miami Correctional Facility for nearly fifty days in February and March 2021. He alleges that his cell had broken lights and a window covered with sheet metal, so was extremely dark. He claims electrical wire dangled from the ceiling and a light fixture weighing 100 pounds fell on his head. He claims this treatment violated his Eighth Amendment right to be free from cruel and unusual punishment and seeks to hold Warden Hyatte and Deputy Warden Payne accountable by way of 42 U.S.C. § 1983.

Mr. Reed sued from prison, so the defendants aren't liable if they can show that Mr. Reed didn't exhaust administrative remedies available to him. *See* 42 U.S.C. § 1997e(a).

*Miami Correctional Facility's Administrative Remedies*

Miami Correctional Facility receives and manages prison grievances according to the Indiana Department of Correction's Offender Grievance Process, Policy and Administrative Procedure 00-02-301, effective since September 1, 2020. In broad strokes, the policy requires that a prisoner complete a formal

3

grievance and two appeals to exhaust a claim. The parties agree that the written policy is as follows.

A prisoner can complain about prison conditions by filing a grievance with the prison. The prison considers only certain issues appropriate for the grievance process, like staff treatment, medical or mental health, acts of reprisal, and other concerns about conditions of care and supervision in prison. A prisoner starts by completing a grievance on State Form 45471, to be completed no later than ten business days from the date of the incident giving rise to the complaint. An offender grievance specialist is to review any grievance within five business days of receiving the grievance. A specialist either rejects the grievance or accepts and records it. A grievance specialist can reject a grievance if it is untimely, relates to more than one event or issue, is illegible, and the like. A rejected grievance is returned to the prisoner with State Form 45475, "Return of Grievance." It is not appealable, but a prisoner can submit a revised State Form 45475 within five business days of when the grievance is returned.

If a grievance specialist accepts the grievance, the grievance is logged into the prison's computer system and filed with any other grievances filed by that same prisoner. The grievance is marked on the prisoner's log with "I – Formal Grievance." The grievance specialist has fifteen business days to investigate and give a response.

A prisoner who is dissatisfied with the prison's response can appeal the response with State Form 45473. Any appeal is due within five business days of the date of the grievance response. A prisoner can also appeal a grievance if

4

there's no response within twenty business days of when the grievance specialist received the response. An offender grievance specialist is to log the date of receipt of the appeal and forward the appeal to the warden. The warden or his designee is to review the appeal within ten business days of receiving the appeal, and the offender grievance specialist is to give a copy of the appeal response to the prisoner.

A prisoner dissatisfied with the warden's decision can lodge an appeal with the Indiana Department of Correction. The prisoner must check the "disagree" box on the warden or his designee's response and submit the response with the completed State Form 45473 and any supporting documentation. This appeal must be made to the offender grievance specialist within five business days of the warden or his designee's appeal response. A prisoner can also appeal if there's no response within ten business days of when the warden received the first-level appeal. The offender grievance specialist is to document the appeal in the grievance database, logging the prisoner's grievance history with "II – Formal Appeal." An appeal of the warden's decision is reviewed by the Department Offender Grievance Manager and is considered final.

The parties disagree over how this policy was implemented and how Mr. Reed used the grievance process.

### *Warden Hyatte and Deputy Warden Payne's Account*

Warden Hyatte and Deputy Warden Payne assert that Mr. Reed didn't exhaust the grievance process. Their evidence includes the Indiana Department

of Correction's Offender Grievance Process, Policy and Administrative Procedure 00-02-301, [Doc. 17-2], Mr. Reed's grievance history, [Doc. 17-3], Mr. Reed's March 1, 2021, grievance, [Doc. 17-4], return of Mr. Grievance's March 1, 2021, grievance, [Doc. 17-5], and a declaration of Michael Gapski, a grievance specialist at Miami Correctional Facility. [Doc. 17-1].

Mr. Gapski reviewed documents relating to Mr. Reed's grievance history and attests to the grievance policy just described. He then attests to Mr. Reed's documented grievance history. He says Mr. Reed submitted a grievance on March 1, 2021, complaining about his cell's condition, specifically a light fixture that hit his head. A grievance specialist returned the grievance on March 12 as untimely. The grievance specialists didn't receive a resubmitted grievance within the five days allowed for resubmissions.

Mr. Reed's complaint alleged that he submitted two grievances about his cell before the March 1 grievance and grievances about conditions in two other cells. Mr. Gapski says the grievance specialists received no such grievances and didn't receive any notice of non-response.

The March 1 grievance is included as an exhibit. The grievance has March 1, 2021, listed as the "date of incident." Mr. Reed complains in the grievance that upon arriving in his cell on February 4, he saw the cell's poor condition, particularly that the light fixture was hanging by wires and a small wing nut and there was no light. He then complains that on March 1, he reported to Sergeant Burton and another official, maybe Sergeant Gall, that the light fixture had fallen on his head. The prison official ignored Mr. Reed so she wouldn't have to fill out

paperwork. Sergeant Gall also threatened to retaliate if Mr. Reed reported the incident. The box labeled "State the relief that you are seeking" says, "I want all broken fixtures in AHU fixed and Gall fired."

The response is included as an exhibit, too. It has a copy of the grievance and a Return of Grievance Form, State Form 45475. The Return of Grievance Form says the grievance was received March 1 and returned March 12. There is a box labeled "Please check the most appropriate response AND provide an explanation." There is a check next to "Your grievance was not timely submitted: . . . Late." There is no check next to "Your complaint cannot be responded to as presented, but may be corrected and submitted again within five (5) business days." Nothing is written in the box labeled "Please describe your response in further details." Grievance specialist T. Riggle signed the form.

Lastly, the defendants include a copy of Mr. Reed's grievance history log. There is a grievance about food quality in March 2021, but no other grievance is recorded around the time Mr. Reed was kept in restrictive housing.

*Mr. Reed's Account*

Mr. Reed asserts that he exhausted all administrative remedies available to him. His evidence includes his own declaration, [Doc. 30-7 at 96–105], the deposition transcript of Michael Gapski, the already-mentioned grievance specialist at Miami Correctional Facility who also served as Rule 30(b)(6) representative for the prison, [Doc. 30-1], the deposition transcript of Charlene A. Burkett, the Director of the Indiana Department of Correction Ombudsman

7

Bureau, [Doc. 30-2 to 30-5], and the deposition transcript of Stacy Hall, a correctional officer and law librarian at Miami Correctional Facility, [Doc. 30-6].

According to Mr. Reed's declaration, he was placed in restrictive housing and immediately after arriving, he filed a grievance about his cell's conditions, but didn't receive a response. He filed another but received no response. He gave the grievances to three different counselors, believing that to be the only way to send a grievance from restrictive housing. One of the counselors was named Ressler.

On March 1, a light fixture fell on Mr. Reed's head, and he filed a grievance. His account about the grievance matches Mr. Gapski's accounts and the defendants' records — the declaration has the same grievance and grievance response attached showing that it was returned on March 12 as untimely. Mr. Reed thought his grievance timely because even though his complaint mentioned darkness going back a couple weeks, he complained about the darkness he experienced at that time (as well as the light fixture falling on him). He notes that a rejected grievance can't be appealed and that, as the grievance response confirms, the response was marked as untimely but wasn't marked as one that could be resubmitted within five days.

Mr. Reed was later transferred to other administrative housing cells. The first had a working light but sheet metal covered the window. The second was completely dark. Mr. Reed filed grievances about both cells as well as grievances about the lack of response to his earlier grievances. None of these grievances received responses.

The declaration concludes by saying that the prison's lack of records doesn't show that he didn't file grievances; Mr. Reed disputes the defendants' grievance history log, contending that it's missing at least five of his grievances. He has been housed at other prisons in Indiana where he received responses and could appeal.

Attached to the declaration are Mr. Reed's grievance and the response, as mentioned, as well as four requests for interview addressed to two different counselors. The requests for interview say that Mr. Reed submitted grievances, yet the prison says they were never received. They're all from July 2022.

Mr. Reed presents Mr. Gapski's testimony as evidence that Miami Correctional Facility didn't follow department policy and made the grievance process impossible. Mr. Gapski, a grievance specialist at Miami Correctional Facility, testified as Miami Correctional Facility's Rule 30(b)(6) representative and described how grievance specialists at Miami Correctional Facility handled the grievance process. He explained that in restrictive housing, like Mr. Reed's unit, a prisoner wishing to file a grievance would complete a grievance form, hand it to a correctional officer, and the correctional officer would put the grievance in prison intraoffice mail to be delivered to the grievance specialists. No grievance is logged until a grievance specialist receives the grievance, and grievance specialists have no way of knowing whether or when a correctional officer accepted a prisoner's grievance, which correctional officer accepted a grievance, or what happened to a grievance that was sent but never received.

9

Mr. Gapski also described how Miami Correctional Facility handles appeals. The Indiana Department of Correction policy says a prisoner can appeal the prison's response to a grievance. A prisoner can appeal the prison's response or "may appeal as though the grievance had been denied" if there's no response within twenty business days of the offender grievance specialist's receipt of the grievance. [Doc. 17-2 at 12]. The policy adds that a prisoner who wishes to file a first-level appeal must complete State Form 45473 and submit it within five business days of the date of the grievance response.

Mr. Gapski explained things differently, explaining an extra unofficial step at Miami Correctional Facility. He said that the prison responds to grievances with an Offender Grievance Response Report. That report explains the prison's response and has a spot to mark "agree" or "disagree." It isn't State Form 45473, which the written policy requires for starting an appeal. If a prisoner wants State Form 45473, he marks "disagree" on the Offender Grievance Response Report and sends it to the grievance specialists. When a grievance specialist receives the report marked "disagree," the specialist sends a copy of State Form 45473 to the prisoner. That copy comes from a grievance specialist and must include the original grievance number on it. [Doc. 30-1 at 46–47]. The grievance specialists forward an appeal to the warden and send a receipt to the prisoner only once the specialists have received a completed State Form 45473.

Mr. Gapski also spoke of how timing is calculated. The grievance policy requires that a prisoner "submit a completed State Form 45471, 'Offender Grievance,' no later than ten (10) business days from the date of the incident

10

given rise to the complaint." [Doc. 15-2 at 9]. The same is true for appeals, except that a prisoner has five business days instead of ten. [Doc. 15-2 at 14]. Mr. Gapski attested that grievance specialists calculate timing based on when they receive an appeal. So an appeal is deemed untimely if not *received* within five business days. Timing doesn't depend on when a prisoner signed an appeal or handed an appeal to a correctional officer, even though prisoners often can't give an appeal directly to a grievance specialist.[2]

Mr. Reed presents deposition testimony of Charlene Burkett, the Director of the Department of Correction Ombudsman Bureau. The Ombudsman Bureau handles prison complaints independently of the Department of Correction and Indiana Department of Administration but doesn't have enforcement power. The Ombudsman Bureau received several complaints from plaintiffs in the consolidated cases, each claiming that Miami Correctional Facility didn't respond to their grievances.

Likewise, Officer Stacy Hall, who was a law librarian in May or June 2021, attested that thirty to forty prisoners complained to her that their grievances didn't receive responses.

## DISCUSSION

Mr. Reed and the defendants move for summary judgment on the exhaustion defense. The governing law is thoroughly set out in the court's

---

[2]    The defendants contend that Mr. Gapski's testimony about timing was only about appeals and not first-level grievances, so Mr. Gapski's testimony can't be used to generalize about how first-level appeals are handled. [Doc. 40 at 11].

opinion and order on cross-motions for summary in <u>Rollins v. Hyatte</u>, 3:21-CV-767-RLM-MGG, slip op. at 11–12, which discussion the court adopts by reference.

Warden Hyatte and Deputy Warden Payne's legal argument is straightforward: the prison's policies plainly require a formal grievance and two levels of appeal. Mr. Reed didn't resubmit his March 1 grievance and their records don't show that Mr. Reed's successfully filed any other grievance about his cell's conditions, so he didn't exhaust administrative remedies.

Mr. Reed's argument is similarly straightforward: the prison didn't respond to grievances and didn't have a process to appeal non-responses, so administrative remedies weren't available.

Approaching from Mr. Reed's perspective makes for a clearer picture.

Mr. Reed argues that two sets of evidence show that administrative remedies weren't available, so he exhausted the steps available to him. The first are his assertions of grievances that didn't receive responses and his second is the grievance that was returned as untimely.

Mr. Reed attests that he submitted two grievances about cell conditions right after arriving in restrictive housing and that neither received a response; the March 1 grievance (discussed later); two grievances about the cells he was reassigned to; and two grievances about the lack of any response. He gave the grievances to counselors because they were the only ones who could accept a grievance in restrictive housing. One of the counselors was named Ressler.

According to Mr. Reed, this evidence shows unavailable administrative remedies because the prison didn't respond to his grievances or appeals. He says that prison officials' consistent failure to respond meant that the process wasn't available. *See* <u>Lewis v. Washington</u>, 300 F.3d 829, 833 (7th Cir. 2002).

This argument appears to hit a snag with the grievance policy. A prisoner must follow any prison rules that require administrative appeals, <u>id.</u> (citing <u>Pozo v. McCaughtry</u>, 286 F.3d 1022, 1025 (2002)), and Miami Correctional Facility's policy required notifying grievance specialists of non-responses and also required that prisoners appeal non-responses.

According to policy, a grievance specialist is to send the prisoner an "unacceptable form" rejecting a grievance or a notice of receipt of an accepted grievance within ten business days of receipt. If the prisoner doesn't receive either within ten business days of submitting it, the prisoner is to notify the grievance specialist of the non-response and retain a copy of the prisoner's own notice to the grievance specialist. The grievance specialist is to respond to that notice within ten business days. The policy then also required that a grievance specialist respond to a grievance within fifteen business days of receipt. If a prisoner didn't receive a response within twenty business days of when the grievance specialists received a grievance, a prisoner was to appeal as if a response had come. The warden was to respond to an appeal within ten business days of receiving the appeal. If he didn't respond by then, a prisoner could appeal as if a response had come. Under these rules, Mr. Reed would exhaust

administrative remedies only if he appealed the lack of a response to a grievance and appealed the lack of a response to his appeal.

This appeals process makes little sense. The part of the policy requiring that a prisoner file a notice of non-response says that the prisoner must do so if ten business days have passed since submitting a grievance. It doesn't give a deadline by which the prisoner must notify the grievance specialist, suggesting that the step isn't mandatory. Nor does the policy define when a grievance is "submitted." Most deadlines in the grievance policy are based on when a prison official receives a grievance or appeal. It's unclear if a grievance is submitted when the grievance is received, which the prisoner would have no way of knowing, or when the prisoner signed the grievance, hands it to a prison official, or puts it in an outbox, which the policy doesn't address. The policy doesn't say how to provide this notice and the prison don't have a form for this purpose; Mr. Gapski testified that there's not a standard form and prisoners can "write on anything." [Doc. 30-1 at 33].

This step's necessity is further obscured by its relation to the first-level appeal. First, the policy at one point says a prisoner "shall" notify the grievance specialist of a non-response [Doc. 17-2 at 9] while saying at another point that the only recognized process includes: (1) a formal attempt to resolve concerns; (2) a written appeal to the warden; and (3) a written appeal to the department grievance manager. [Doc. 17-2 at 3]. Second, the policy says a prisoner can appeal a non-response as if there'd been a response if twenty business days have passed from the grievance specialist's receipt of the grievance. The policy doesn't

14

say that the prisoner can appeal only once he's filed a notice of non-response or once a grievance specialist has responded to a notice of non-response. This part of the policy is opaque and incapable of use for non-responses.

Appealing non-responses is likewise confusing. The prisoner can notify the grievance specialist of a non-response after ten days of submitting it, but a prisoner can file an appeal only by filing State Form 45473. Mr. Gapski describes an unauthorized step requiring a prisoner to first mark another form with "disagree" before receiving State Form 45473. But a prisoner can't mark "disagree" on a form he never receives. This is a dead end.

The defendants insist that Miami Correctional Facility recognizes only the official policy, contrary to what Mr. Gapski says. But even if the prison follows the written policy to a tee, appeals are unavailable for non-responses. The policy tells prisoners to appeal as if the grievance had been denied but doesn't say how a prisoner is to get a copy of State Form 45473,[3] much less how a prisoner in restrictive housing, like Mr. Reed was, is to get ahold of State Form 45473.

The same deficiencies apply to the second-level appeal. Policy dictates that a prisoner starts a second-level appeal by marking the warden's first-level response with "disagree." The defendants and the policy don't explain how a

---

[3]     Mr. Reed asserts that the only way a prisoner gets State Form 45473 is to receive one from a grievance specialist after completing the unofficial and unauthorized step. The defendants object to this assertion as not supported by Mr. Gapski's testimony — he said that State Form 45473 comes from him but didn't exactly say that there was no other way to get the form. [Doc. 30-1 at 47]. Still, the defendants never explain how a prisoner who doesn't receive a response can get State Form 45473, nor does the written policy address this crucial step.

prisoner who receives no response to the first-level appeal can mark "disagree" on a form that they don't have and that might not even exist.

If Mr. Reed is believed, he has exhausted *available* remedies. Mr. Reed could have notified the grievance specialist of the non-response, but the policy lacks detail of how or when to do this and doesn't say that this is a prerequisite to the mandatory appeal of a non-response. Mr. Reed could appeal the prison's lack of response after the prison's time to respond lapsed, but that appeal was made impossible because Miami Correctional Facility required State Form 45473 to appeal. It provided State Form 45473 form only after a prisoner completed the unauthorized intermediate step involving the Offender Grievance Response Report. If the defendants are right and they followed the policy word for word, they still don't explain gaps in the policy that don't account for non-responses. Nothing in the written grievance policy tells a prisoner how to appeal if he never receives a response or State Form 45473. Ultimately, the policy's rules about appeals are "based on the assumption that the prisoner has received a response to his original grievance," and doesn't account for non-responses. Knighten v. Mitcheff, No. 1:09-cv-333, 2011 U.S. Dist. LEXIS 2910, at *8–9 (S.D. Ind. Jan. 10, 2011). This policy gap means "there is no adequate appeals process," so Mr. Reed "cannot be faulted for failing to appeal." Id. (citing Dole v. Chandler, 438 F.3d 804, 809–810 (7th Cir. 2006)).[4]

---

[4]     Another gap in the policy involves timing. Mr. Reed had to appeal a non-response within twenty business days of when grievances specialists received a grievance or ten business days of when the warden received an appeal. Timing didn't depend on when Mr. Reed signed or sent a grievance or appeal, and he had no way of knowing when someone else received his grievance or appeal. A

The defendants try to undermine Mr. Reed's evidence. First, they characterize Mr. Reed's declaration as self-serving and insist that it is therefore of no use at summary judgment unless unaccompanied by other evidence. [Doc. 41 at 35]. (citing Buie v. Quad/Graphics, Inc., 366 F.3d 496, 504 (7th Cir. 2004)). They say that without "additional evidence," his declaration isn't enough to defeat summary judgment.

The rule that a self-serving declaration or affidavit alone can't defeat summary judgment has been bad law for a decade in this circuit. Hill v. Tangherlini, 724 F.3d 965, 967–968 (7th Cir. 2013) ("[T]he term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). The court of appeals expressly overruled a litany of its cases "to the extent that they suggest a party may not rely on 'self-serving' evidence to create a material factual dispute." Id. at 967 n.1. A self-serving declaration can defeat summary judgment as long as it meets the requirements of any declaration. Foster v. PNC Bank, 52 F.4th 315, 320 (7th Cir. 2022). The self-serving nature of Mr. Reed's declaration isn't reason to discard it.

Next, the defendants assert that Mr. Reed's claims are too vague. They contend that the declaration is too vague about his first two grievances because he doesn't say when, how, and to whom he gave the grievances nor says what the grievances were about. The complaint alleges and the defendants don't

---

prisoner who doesn't receive a response is apparently left to speculate about when an appeal of a non-response is due.

contest that Mr. Reed arrived in restrictive housing on February 4. His declaration says he filed a grievance immediately after arriving, which is specific enough to say that he filed it on or shortly after February 4, and that the second was filed sometime between February 4 and March 1. Mr. Reed also specifies that he gave the grievances to counselors, which is specific enough for the immaterial fact of the counselor's identity. He specifies counselor Ressler as one who accepted a grievance. Mr. Reed says the grievances complained about his cell conditions, which is specific enough in this context. These objections aren't reason to reject Mr. Reed's assertions. The defendants object to the alleged grievances after March 1 as too vague. Even if true, that wouldn't undermine that Mr. Reed filed earlier grievances.

Mr. Reed shows unavailability of remedies with his March 1 grievance, too. The grievance was rejected as untimely even though Mr. Reed filed it the same day that the light fixture fell on his head. Prisoners aren't allowed to appeal rejected grievances. An alternative is resubmitting an amended grievance, as the written policy says is the prisoner's responsibility, but the grievance response said otherwise. The parties both included the grievance response indicating that the complaint was untimely. The response had no additional explanation, despite instruction on the form for a grievance specialist to include a written explanation. Nor did the grievance specialist check the box telling a prisoner he could amend and resubmit the grievance. So the policy told Mr. Reed one thing—he must resubmit the grievance—but the form and grievance specialist told him another—that his grievance is untimely and can't be resubmitted.

18

The defendants say Mr. Reed should have resubmitted the form and tried to show good cause for his delay. [Doc. 40 at 9]. Maybe if he'd shown good cause, his grievance would be accepted, but instead "Plaintiff's statement merely resembled a stale complaint of past conditions that did not seek any specific relief." [Doc. 40 at 9].

This answer is non-responsive to the obstacles in Mr. Reed's way. He was told on the form that the grievance was late, and the grievance specialist didn't mark the box indicating the grievance could be fixed and resubmitted. No reasonable person would receive that response and think the grievance specialists would consider a resubmitted complaint. It would be futile to cure an untimely grievance by filing an even less timely grievance. Moreover, the defendants' assertion that the grievance resembled a stale complaint seeking no specific relief is confusing. The grievance says a light fixture fell on Mr. Reed's head the day the grievance was written. That's not stale. The grievance has a box labeled "State the relief that you are seeking" and Mr. Reed wrote "I want all broken fixtures in AHU fixed." That relief is specific.

Mr. Reed exhausted available grievances with his March 1 grievance. Prison staff made Mr. Reed think that resubmitting a grievance wasn't an option while simultaneously demanding that he resubmit a grievance to exhaust remedies. He also shows exhaustion by attesting that he submitted other grievances that received no response; the prison demanded that a prisoner appeal a non-response by including the response in the appeal, an impossible task. Mr. Reed has shown exhaustion of available remedies, so he's entitled to

judgment on the affirmative defense unless the defendants can somehow prove they're nevertheless entitled to judgment or can show that there's a genuine dispute of material fact requiring a <u>Pavey</u> hearing. *See* <u>Pavey v. Conley</u>, 544 F.3d 739 (7th Cir. 2008).

Warden Hyatte and Deputy Warden Payne argue that administrative remedies were available and Mr. Reed didn't exhaust them, so they're entitled to summary judgment.

The defendants argue the administrative process wasn't onerous because other prisoners successfully finished the entire process. They cite evidence that Mr. Blanchard, a plaintiff in a consolidated case, 3:21-CV-160, completed all three steps. So, they say, "the evidence in the record shows that at least some offenders in the restrictive housing cells were able to fully exhaust their administrative remedies contradicts Mr. Reed's claim that the administrative remedies were systematically unavailable." [Doc. 40 at 9].

That the prison logged and responded to another prisoner's grievances and appeals doesn't contradict Mr. Reed's claims. Mr. Reed claims that *his* grievances didn't receive a response, not that no grievance ever received a response. He includes evidence of systemic failures to bolster his claim, but his claim rests on his declaration. Plus, Mr. Blanchard received responses, so he, unlike Mr. Reed, didn't face the impossible task of appealing a non-response when an appeal requires a form that comes only with a response.

The defendants then argue that administrative remedies were available because Mr. Reed received information about the process during admission and

orientation. This is a red herring. Mr. Reed's argument depends on whether he was given responses and could appeal those responses in practice. His argument doesn't hinge on whether he was ever told what the policy required on paper. Even if Mr. Reed knew the policy, the defendants' evidence doesn't contradict Mr. Reed's claims that his grievances never received responses and his evidence that gaps in the policy (grievances aren't marked until received, the grievance specialists don't know who collects a grievance and when, and the like) allow grievances to go missing. His knowledge of the procedure doesn't show that he failed to exhaust by not appealing, either, when he's shown that appealing non-responses was impossible in practice.

Finally, Warden Hyatte and Deputy Warden Payne argue that they're entitled to summary judgment because they have no institutional records of Mr. Reed's grievances and appeals about housing conditions. If there are no records of a grievance or appeal, they must not have been filed.

This argument doesn't controvert Mr. Reed's evidence that he submitted grievances because it rests on the faulty assumption that every grievance that a prisoner gives to prison staff is received and logged by grievance specialists. Put differently, it assumes that a grievance doesn't get marked as received only if a prisoner didn't send it. Mr. Gapski's testimony about prison staff's inability to track grievances between when a prisoner tries to send it and the grievance specialists receive it refutes this premise. So while the defendants claim that the lack of institutional records of *these* grievances shows non-exhaustion, the lack

of records is consistent with Mr. Reed's version of events. As Judge Barker, in a similar case, explained:

> Although there is no record of any of these grievances in the prison database, that record is obviously only accurate as to the grievances that are actually inputted into the system by prison officials. In other words, even if a prisoner properly submits a grievance to an appropriate prison official, if the prison grievance specialist does not receive it, either because it is lost or forgotten, or if the grievance specialist fails for some other reason to input the grievance into the system, there would be no record of it having been filed.

Knighten v. Mitcheff, No. 1:09-cv-333, 2011 U.S. Dist. LEXIS 2910, at *6–7 (S.D. Ind. Jan. 10, 2011).

Among their arguments, the defendants imply that allowing finding exhaustion would undermine the Prison Litigation Reform Act by making the exhaustion defense meaningless. "[A]ny Plaintiff could succeed on a claim alleging that they exhausted administrative remedies simply by demonstrating that there is no record of any grievance filed." [Doc. 40 at 6].

First, not all prisoners have evidence that practice and policy caused gaps that could prevent a grievance from getting received, or evidence that a response to a grievance made filing the grievance impossible.

Second and more fundamentally, a prisoner's word might be all that he has. If a prison loses grievances before they're filed, a plaintiff often has only the lack of records and his own word to show exhaustion of remedies. As Judge D'Agostino observed, "it is unclear what evidence Defendants expect Plaintiff to produce of his grievances that were allegedly discarded by corrections officers." Reid v. Marzano, No. 9:15-CV-761, 2017 U.S. Dist. LEXIS 38547, at *10 (N.D.N.Y. Mar. 17, 2017). Judge D'Agostino noted that a prisoner would ideally

keep photocopies for his records, but that doing so was unrealistic because the plaintiff didn't have access to the law library. Id. The same is true for Mr. Reed, even if he doesn't specifically allege that correctional officers discarded his grievances; he was in restrictive housing so it's unclear how he could have kept records for himself. And worse yet, taking the defendants' argument to its logical conclusion cuts against their own argument. Accepting that a prisoner can't rely on the lack of evidence of grievances would incentivize prisons to destroy or lose all grievances and prohibit prisoners from keeping copies of their grievances. A plaintiff would have only his word and the defendants could always reply, "our lack of records and your word aren't enough." The defendants warn against making the defense meaningless, but their position could lead to a perversely impenetrable defense.

In summary, the defendants' argument that the absence of evidence is the evidence of absence doesn't contradict Mr. Reed's evidence that administrative remedies weren't available. The defendants' evidence is consistent with Mr. Reed's claims, so doesn't create a genuine issue as to whether administrative remedies were available to Mr. Reed. Administrative remedies weren't available to Mr. Reed, so he satisfied 42 U.S.C. § 1997e(a) before suing.

A court normally holds a Pavey hearing to resolve factual disputes bearing on administrative exhaustion, but needn't hold a hearing if it can resolve the issue of exhaustion on the documentary evidence. Bessler v. Wexford of Ind. LLC, No. 3:21-CV-691, 2022 U.S. Dist. LEXIS 199409, at *7–8 (N.D. Ind. Nov. 2, 2022). Neither party requested a Pavey hearing and the consistency between Mr.

Reed's claim of exhaustion and the defendants' evidence means there's no genuine issue of material fact. Accordingly, the court denies the defendants' motion for summary judgment and grants Mr. Reed's motion for summary judgment without a <u>Pavey</u> hearing.

Mr. Reed requested oral argument to help the court narrow its focus on the voluminous records and briefs across the consolidated cases. Oral argument is unnecessary, so the court denies the request for oral argument.

CONCLUSION

For these reasons, the court DENIES the defendants' motion for summary judgment; GRANTS Mr. Reed's motion for summary judgment; REJECTS the exhaustion defense; and DENIES AS MOOT Mr. Reed's motion for consolidated oral argument.

SO ORDERED.

ENTERED:   August 15, 2023

_____ /s/ Robert L. Miller, Jr.
Judge, United States District Court